******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROY D. L.*
(SC 20152)

Robinson, C. J., and McDonald, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted, after a trial to the court, of sexual assault in the first degree, sexual assault in the fourth degree, and risk of injury to a child in connection with the sexual abuse of his daughter, R, when she was ten years old, the defendant appealed to this court. During a forensic interview conducted in response to R's statement to a camp counselor that the defendant had been touching her inappropriately, R stated that the defendant had on multiple occasions touched her vagina and vaginal area. R also reported that the defendant's conduct caused her to experience pain and made her feel uncomfortable. At trial, the court admitted, over defense counsel's objection, a video recording of the forensic interview, and the defendant, through his own testimony, denied inappropriately touching R. In addition, the defendant presented the testimony of his sister and former girlfriend, S, both of whom testified that R experienced dry skin around her vaginal area. S testified that the defendant supervised R as she cleaned herself but did not touch her directly. The court found R's account to be credible and rejected the contrary testimony offered by the defendant. *Held*:

1. The trial court did not abuse its discretion in admitting the video recording of R's forensic interview into evidence under the medical treatment exception to the hearsay rule: the interview took place in a hospital, during which a forensic interviewer asked R about her physical and mental well-being, and the interviewer testified at the defendant's trial that, as a result of the substance of R's statements during the interview, she encouraged a medical examination of and therapy for R; accordingly, on the basis of R's statements and the circumstances in which they were made, including the location of the interview and the nature of the interviewer's questions, an objective observer reasonably could infer that R's statements were made for the purpose of receiving medical treatment and were pertinent to that end.

2. The defendant could not prevail on his claim that he was deprived of a fair trial on the ground that the prosecutor improperly referred to facts not in evidence and commented on the credibility of a witness insofar as he mischaracterized the testimony of J, the defendant's former girlfriend, by stating that J had previously admitted that she saw the defendant inappropriately touch R: even if the prosecutor's statements were improper, this court was provided with the requisite assurance that the defendant was not deprived of a fair trial, as the trial court, which was the trier of fact, expressly rejected the allegedly improper statements, it having acknowledged, following defense counsel's objection to the prosecutor's remarks concerning J, the concerns that motivated the objection and having stated that it would not consider the prosecutor's statements in determining the defendant's guilt; moreover, the court noted that, if the prosecutor's comments regarding J had been made during a jury trial, it would have instructed the jury that it was its recollection of the evidence that controlled, and there was no evidence that the court failed to follow its own instructions.

3. The defendant could not prevail on his claims that the evidence was insufficient to prove that he engaged in the criminal conduct described by R during her forensic interview and at trial because he presented witnesses who contradicted R's testimony, and that the evidence was insufficient to prove that he acted with the intent to degrade or humiliate R, or that he gained sexual gratification from engaging in the conduct in question, for purposes of his conviction of sexual assault in the fourth degree: the trial court credited R's testimony and discredited the contradictory testimony offered by the defense, and R's testimony was sufficient to support the court's conclusion that the defendant engaged in the criminal conduct on which his conviction was based; moreover, there was sufficient evidence to establish that the defendant acted with

the necessary intent to be convicted of sexual assault in the fourth degree, as the evidence adduced by the state, including R's testimony, was sufficient to support the trial court's conclusions that the defendant's contact with R's intimate parts, despite her repeated pleas to him that he stop, was made for the purpose of degrading or humiliating her, and that the defendant acted for the purpose of his sexual gratification.

4. Contrary to the defendant's claim, the statutes criminalizing sexual assault in the first degree and risk of injury to a child were not unconstitutionally vague as applied to the defendant's conduct; the language of those statutes and the relevant judicial decisions interpreting them provide a person of ordinary intelligence with fair notice that the digital penetration of a child's vagina and the touching of a child's vagina with a rag in a sexual and indecent manner are criminally prohibited.

Argued January 14—officially released July 28, 2021**

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of sexual assault in the third degree, sexual assault in the fourth degree, and risk of injury to a child, and one count of the crime of sexual assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Gold, J.*; thereafter, the court, *Gold, J.*, granted the defendant's motion for a judgment of acquittal as to both counts of sexual assault in the third degree; subsequently, finding of guilt with respect to two counts of risk of injury to a child and one count each of sexual assault in the first degree and sexual assault in the fourth degree; thereafter, the court, *Gold, J.*, vacated the defendant's conviction as to one count of risk of injury to a child and rendered judgment of conviction, from which the defendant appealed to this court. *Affirmed.*

*Trent A. LaLima*, with whom, on the brief, was *Hubert J. Santos*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Gail P. Hardy*, former state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. Following a trial to the court, *Gold, J.*, the defendant, Roy D. L., was convicted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), and risk of injury to a child in violation of General Statutes § 53-21 (a) for the sexual abuse of his daughter, R. On appeal,[1] the defendant claims that (1) the trial court abused its discretion in admitting into evidence a video recording of R's forensic interview under the medical treatment exception to the hearsay rule, (2) the prosecutor improperly introduced facts not in evidence and commented on the credibility of a witness during closing argument, thereby depriving him of a fair trial, (3) the evidence presented at trial was insufficient to support his convictions, and (4) the statutes criminalizing sexual assault in the first degree and risk of injury to a child are unconstitutionally vague as applied to his conduct. We disagree with each of the defendant's claims and, accordingly, affirm the judgment of the trial court.

The following facts, which are either undisputed or reasonably could have been found by the trial court, and procedural history are relevant to this appeal. The defendant's conviction stems from his sexual contact with R in 2015, when she was ten years old. The defendant's inappropriate touching of R first came to light in 2008, when R, who was just three years old at the time, reported to an employee of her school that the defendant had "hurt her pooky," referring to her vagina. The school reported R's statement to the Department of Children and Families (department), which immediately opened an investigation. That day, a representative of the department spoke with the defendant, who stated that R had a medical condition that required him to regularly clean her vaginal area with a cloth and Vaseline. The defendant claimed that he "was the only one [who] knew how to clean [R's] genitals."

During the course of the department's investigation, R was examined by Audrey Courtney, an advanced practice registered nurse at the Saint Francis Hospital Children's Advocacy Center (Children's Advocacy Center). At trial, Courtney testified that, prior to her examination of R, the defendant described to her "some hygiene practices where he was separating [R's] labia after he would wash her." Courtney testified that, during the examination, she did not observe any condition on R's skin that would have necessitated the defendant's conduct. In the hopes of steering the defendant toward more appropriate and less intrusive hygiene practices, Courtney recommended to the defendant that he stop physically cleaning R's vaginal area and use a sitz bath instead.

As a part of its investigation, the department filed a

neglect petition against the defendant. In the subsequent proceedings, the defendant signed a written agreement in which he committed to stop physically cleaning R's vaginal area and acknowledged that the cleaning practices recommended by the Children's Advocacy Center and R's pediatrician were more appropriate.[2] According to R's mother, the defendant stopped bathing R after the signing of the agreement, and she assisted R with her daily hygiene until she was eight years old. In 2013, the defendant and R's mother separated, and R began splitting time between her mother's residence and the defendant's residence.

In July, 2015, when R was ten years old, she reported to a camp counselor that the defendant had been "touching" her. The counselor reported R's statement to the department, and a second investigation was opened into the defendant's conduct. On August 19, 2015, R was once again taken to the Children's Advocacy Center where she participated in a forensic interview conducted by Lindsay Craft, a trained forensic interviewer. During that interview, R told Craft that, while she was staying at his home, the defendant had, on multiple occasions over the prior year, touched her vagina and vaginal area after she had showered. R described how the defendant, using a rag, would spread Vaseline over her entire naked body and penetrate her vagina using his fingers. R told Craft that the defendant's conduct caused her physical pain and made her feel uncomfortable.

The defendant was subsequently arrested and charged with one count of sexual assault in the first degree, two counts of sexual assault in the third degree, two counts of sexual assault in the fourth degree, and two counts of risk of injury to a child.[3] The defendant affirmatively elected a bench trial. At trial, the court admitted, over defense counsel's objection, a video recording of R's forensic interview in its entirety pursuant to the medical treatment exception to the hearsay rule. See Conn. Code Evid. § 8-3 (5).

At the trial's conclusion, the court found the defendant guilty of one count of sexual assault in the first degree, one count of sexual assault in the fourth degree, and two counts of risk of injury to a child.[4] In its oral decision, the trial court expressly credited R's testimony and rejected the defendant's contention that R's "account [was] a wholesale fabrication" and that he was "being set up by R's mother and [the department] . . . ." The trial court sentenced the defendant to a total effective sentence of fifteen years of imprisonment, execution suspended after nine years, followed by twenty years of probation and one year of special parole. The defendant was also ordered to register as a sex offender. The defendant subsequently appealed to this court. Additional facts and procedural history will be set forth as necessary.

In the present appeal, the defendant raises four separate claims of error. First, the defendant argues that the trial court abused its discretion by admitting the video recording of the forensic interview of R into evidence under the medical treatment exception to the hearsay rule because the interview "had virtually no medical purpose . . . ."[5] Second, the defendant contends that the prosecutor engaged in prosecutorial impropriety during his closing argument by mischaracterizing the testimony of Jessica Jackson, the defendant's former girlfriend, thereby depriving him of a fair trial. Third, the defendant argues that the state's evidence was insufficient to support his conviction on all counts. Finally, the defendant contends that the statutes criminalizing sexual assault in the first degree, § 53a-70 (a) (2), and risk of injury to a child, § 53-21 (a) (2), are unconstitutionally vague as applied to his conduct. We address these claims in turn.

I

The defendant argues that, because the forensic interview of R had "virtually no medical purpose" and was conducted to "create admissible, inculpatory evidence," the video recording was inadmissible under our case law interpreting the scope of the medical treatment exception contained in § 8-3 (5) of the Connecticut Code of Evidence. According to the defendant, he was prejudiced by the admission of the video recording because it corroborated R's in-court testimony and caused the trial court to credit R's testimony over the contradictory testimony presented by the defendant's witnesses. The state, in response, argues that the video recording of the interview is admissible under the exception because medical treatment or diagnosis was *a* purpose of the interview, and, given the circumstances surrounding the interview, R "necessarily would have understood the interview to have a medical purpose." We agree with the state.

The following additional facts and procedural history are relevant to our consideration of this claim. We begin by describing the contents of the video recording of R's forensic interview at the Children's Advocacy Center. At the outset of the interview, Craft introduced herself to R and explained that her job was to talk to children "about things that have happened to them . . . that just made them feel uncomfortable." Craft told R that people she worked with were observing the interview through a one-way mirror and that their observation of the interview would prevent her from having to "talk about the same thing over and over and over again." Craft then stated that the observers "want to make sure that [children's] bodies are okay, that [the children are] okay." Craft also noted that she worked for the hospital, not the department.

During the interview, R described the defendant's

practice of touching her vaginal area with a rag after she showered at the defendant's home. In response to Craft's questions about the precise nature of the defendant's conduct, R stated that, after she exits the shower, the defendant frequently directs her to lie naked on his bed, and then applies Vaseline to her entire body, including her vagina, using a rag. R told Craft that it was physically painful, stating that the defendant "uses a rough rag and . . . goes in hard and sometimes when he's done doing it, it aches hard." R also told Craft that the defendant "digs through it and its hurts" and that "he [takes] the rag and he goes through it in like the dark spots . . . ." Toward the end of the interview, Craft asked R if she "worries about [her] body because of [what happened]?" R responded, "yes," and then wondered aloud, "am I going to have to survive this when I'm older?"

During trial, the prosecutor moved to admit the entirety of the video recording under the medical treatment exception to the hearsay rule. In support of this motion, the prosecutor presented testimony from Craft.[6] Craft testified that she is a trained social worker who, at the time of her employment at the Children's Advocacy Center, was responsible for conducting forensic interviews of children. Craft noted that the "purpose of a forensic interview is for medical treatment and diagnosis of the child" and that, during her interview of R, she specifically inquired about R's physical and mental well-being. Craft further remarked that, following her interview with R, she "strongly encouraged . . . a medical examination, as well as . . . therapy for the child." Craft explained that she made this recommendation because R "reported significant pain on multiple incidents . . . she also had concerns about her body . . . [and she] worried . . . [it] was going to happen again . . . ."

Defense counsel objected to the admission of the video recording and argued that the interview was "a fig leaf to cover [a] law enforcement practice" and that, "while medical treatment does not need to even be the primary purpose," the state failed to even satisfy "a de minimis test."[7] In response, the prosecutor argued that the video recording was admissible because Craft established that the purpose of the interview, "at least in part," was "medical treatment . . . ." The trial court, citing *State* v. *Griswold*, 160 Conn. App. 528, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015), and *State* v. *Eddie N. C.*, 178 Conn. App. 147, 174 A.3d 803 (2017), cert. denied, 327 Conn. 1000, 176 A.3d 558 (2018), as well as other Appellate Court decisions, concluded that the video recording satisfied the standard for admissibility and overruled defense counsel's objection.

Our standard of review for evidentiary claims is well settled. "We review the trial court's decision to admit

[or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . . In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818–19, 970 A.2d 710 (2009).

"It is well settled that . . . [a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014); see also Conn. Code Evid. § 8-3 (5). Section 8-3 (5) of the Connecticut Code of Evidence excludes from the hearsay rule "[a] statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment." The rationale for admitting such statements "is that the patient's desire to recover his health . . . will restrain him from giving inaccurate statements to [those who] advise or treat him." (Internal quotation marks omitted.) *State* v. *Cruz*, 260 Conn. 1, 7, 792 A.2d 823 (2002).

As we recently noted in *State* v. *Manuel T.*, 337 Conn. 429, A.3d (2020), § 8-3 (5) "sets forth . . . a two-pronged test. The first [prong] addresses the declarant's purpose or motivation in the making of the statement, and the second addresses the pertinence of the statement to that end." Id., 439. The application of the medical treatment exception, therefore, turns in the first instance on the declarant's state of mind and the purpose for which each individual statement was made. See id., 447 (noting that "the medical treatment exception focuses on the declarant's [understanding of the] purpose in making individual statements"). The purpose prong is satisfied so long as the declarant's statement was motivated, at least in part, by a desire to obtain medical treatment or a diagnosis. See id., 440–41 n.12; see also *State* v. *Griswold*, supra, 160 Conn. App. 552–53 (noting that medical treatment or diagnosis does not have to be principal motivation of statement for it to be admissible under medical treatment exception).

In cases involving juveniles, the Appellate Court has consistently recognized that the motivation behind a juvenile's statement can be inferred from both the content of the statement and the surrounding circumstances. See, e.g., *State* v. *Griswold*, supra, 160 Conn.

App. 556 ("[a]lthough [t]he medical treatment exception to the hearsay rule requires that the statements be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, [we] have permitted this requirement to be satisfied inferentially" (internal quotation marks omitted)); see also *State* v. *Ezequiel R. R.*, 184 Conn. App. 55, 69, 194 A.3d 873 (concluding that "circumstances leading up to the victim's interview . . . could lead an objective observer to reasonably infer that the victim's statements were given in order to obtain medical treatment and diagnosis"), cert. granted, 330 Conn. 945, 196 A.3d 804 (2018) (appeal dismissed February 15, 2019); *State* v. *Telford*, 108 Conn. App. 435, 443, 948 A.2d 350 (testimony of twelve year old declarant and circumstances surrounding interview permitted inference that statements were made for purpose of medical treatment), cert. denied, 289 Conn. 905, 957 A.2d 875 (2008); *State* v. *Donald M.*, 113 Conn. App. 63, 71, 966 A.2d 266 (statements by interviewer supported inference that child understood interview had medical purpose), cert. denied, 291 Conn. 910, 969 A.2d 174 (2009). Although some jurisdictions have refrained from adopting such an approach; see, e.g., *State* v. *Coates*, 405 Md. 131, 143–45, 950 A.2d 114 (2008); the overwhelming majority of jurisdictions have recognized that the purpose of a juvenile declarant's statement can be inferred under such circumstances. See, e.g., *United States* v. *Kootswatewa*, 893 F.3d 1127, 1132–34 (9th Cir. 2018) (evidence that juvenile's statements were made "in response to questions posed by a medical professional during a medical examination conducted at a medical facility" supported inference that juvenile understood she was providing information for diagnosis or treatment); see also *United States* v. *Norman T.*, 129 F.3d 1099, 1101, 1105–1106 (10th Cir. 1997) (evidence that five year old declarant complained of pain to doctor in hospital supported inference that declarant was seeking medical treatment), cert. denied, 523 U.S. 1031, 118 S. Ct. 1322, 140 L. Ed. 2d 485 (1998); *State* v. *Letendre*, 161 N.H. 370, 372, 374–75, 13 A.3d 249 (2011) (circumstances surrounding statements supported inference that ten year old victim's statements were made for purpose of obtaining medical diagnosis or treatment); *State* v. *McLeod*, 937 S.W.2d 867, 871–72 (Tenn. 1996) (evidence that eleven year old declarant discussed her medical history and circumstances of alleged assault with doctor supported inference that statements were made for purpose of medical treatment).

We conclude that the reasoning adopted by the majority of jurisdictions is persuasive and consistent with our case law concerning the medical treatment exception to the hearsay rule. In *Manuel T.*, we noted that "the proper application of the existing medical treatment hearsay exception . . . [can] ensure the reliability of . . . statements made at a forensic interview." *State* v.

*Manuel T.*, supra, 337 Conn. 448. In cases in which the substance of a juvenile declarant's statement and the circumstances surrounding the statement support an inference that the statement was made in furtherance of obtaining medical treatment, a trial court can reasonably conclude that the purpose prong of the medical treatment exception is satisfied. See *United States* v. *Kootswatewa*, supra, 893 F.3d 1133; see also *State* v. *Telford*, supra, 108 Conn. App. 441 (statements admissible under medical treatment exception if "objective circumstances of the interview would support an inference that a juvenile declarant knew of its medical purpose").

As we have previously noted, the rationale behind the medical treatment exception is that a person's "desire to recover his [or her] health" incentivizes them to tell the truth to individuals involved in their medical care. (Internal quotation marks omitted.) *State* v. *Cruz*, supra, 260 Conn. 7. We agree with the Appellate Court that the presumption that such statements are reliable applies to statements made during a forensic interview when the surrounding circumstances "could lead an objective observer to reasonably infer that the victim's statements were given in order to obtain medical treatment and diagnosis."[8] *State* v. *Ezequiel R. R.*, supra, 184 Conn. App. 69; see also *State* v. *Abraham*, 181 Conn. App. 703, 713, 187 A.3d 445 ("the statements of a declarant may be admissible under the medical treatment exception if made in circumstances from which it reasonably may be inferred that the declarant understands that the interview has *a* medical purpose" (emphasis in original)), cert. denied, 329 Conn. 908, 186 A.3d 12 (2018).

With this principle in mind, we consider whether the trial court abused its discretion in admitting the video recording of the forensic interview of R under the medical treatment exception.[9] Craft's interview with R took place in a hospital. At the very beginning of the interview, Craft told R that she "work[ed] for the hospital" and that people who "[she] work[s] with" were observing the interview because they "want to make sure that [children's] bodies are okay and that [the children are] okay . . . ." During the course of the interview, Craft asked R about her physical and mental well-being. In response to these questions, R stated that her vagina "ache[d] hard" as a result of the defendant "dig[ging] through" the "deep dark" part. R also stated that she was "scared a lot" due to the defendant's conduct and that she worried about the impact the abuse would have on her body. R also expressed concern that she would "have to survive this when I'm older . . . ."

At trial, Craft testified that as a result of R's statements during the interview, she "strongly encouraged . . . a medical examination, as well as . . . therapy for the child." Craft further testified that, although she

does not always make a medical referral after each interview, she did so in this case because R "reported significant pain on multiple incidents . . . she also had concerns about her body . . . [and she] worried . . . [it] was going to happen again . . . ." Based on the substance of R's statements and the circumstances in which they were made, including the location of the interview and the nature of Craft's questions, an objective observer could reasonably infer that R's statements were both made for the purpose of receiving medical treatment and pertinent to that end. We, therefore, conclude that the trial court did not abuse its discretion in admitting the video recording of the forensic interview under the medical treatment exception to the hearsay rule.

II

The defendant next claims that the prosecutor deprived him of his right to a fair trial by improperly referring to facts not in evidence and by expressing his opinion regarding the credibility of a witness during the course of closing arguments. Specifically, the defendant contends that the prosecutor mischaracterized the testimony of Jackson, the defendant's former girlfriend, when he stated that she had previously admitted to having seen the defendant inappropriately touch R. In response, the state argues that the prosecutor's statement was proper because it was based on a reasonable inference drawn from Jackson's testimony and, "at worst, [was] an honest recollection of the evidence based on the evasiveness of Jackson's testimony . . . ." In the alternative, the state contends that, even if the statement was improper, it did not deprive the defendant of a fair trial. Having reviewed the record, we agree with the state and conclude that the allegedly improper remark did not deprive the defendant of a fair trial.

The following additional facts and procedural history are relevant to our consideration of the defendant's claim. During trial, the prosecutor called Jackson as a witness. At the beginning of his direct examination, the prosecutor asked Jackson if she had ever witnessed the defendant wash R or wipe R's vaginal area. Jackson responded in the negative, and the following colloquy ensued between Jackson and the prosecutor:

"Q. Now . . . did you have a conversation when you were reached out to by Detective [Jason] Pontz?

"A. Yes.

"Q. And did you acknowledge that—did you tell him that you did witness that?

"A. No. I can clarify that. Basically, [the defendant] was just telling [R] what to do to make sure that [she] was clean.

"Q. Oh, so you're familiar with what I'm talking about?

"A. Yes, I am.

"Q. Can you describe what you saw?

"A. So, [R] was just [lying] on the bed, and [the defendant] was letting her know what to do to make sure she was clean.

"Q. How was [the defendant] doing it?

"A. [The defendant] didn't do it.

"Q. Well, what was being done?

"A. [R] was just wiping with the rag.

"Q. [R] was wiping with a rag. [The defendant] did not have it in his hand?

"A. No."

After asking Jackson for more details about how R used the rag, the prosecutor asked, "[a]nd do you recall having a conversation with my office saying that you saw [the defendant] wiping R's vaginal area with the rag?" Jackson responded "no," and again stated that she was "just clarifying that [R] did it. [The defendant] may have had the rag at one point, but [R] did it." Toward the end of his direct examination, the prosecutor again questioned Jackson about a discrepancy between her prior statement to the police and her trial testimony. The following colloquy then ensued between Jackson and the prosecutor:

"Q. Did you tell [the defendant] what you had told . . . Pontz or a member of my office?

"A. Yes.

"Q. And how come it's different today than what you had told them?

"A. Well, when you called me, I was actually . . . on my lunch break. I was driving. I was on the phone, so it was a bad time.

"Q. Would you agree that what you told me was essentially what you told . . . Pontz previously?

"A. Yes.

"Q. That you were somewhat put on the spot when you told me that information?

"A. Right.

"Q. Even though you said the same thing to . . . Pontz a week prior?

"A. Yes.

"Q. But today you have the ability to clarify all of that [information]?

"A. Yes, and that's because I took the time to recall certain events.

"Q. And none of that—none of your clarification was

influenced by you speaking with [the defendant]?

"A. Not at all."

During his closing argument, the prosecutor stated that "Jackson came in and acknowledged that she witnessed the defendant engaged in this conduct [of cleaning R's vagina]. And she told . . . Pontz . . . and she told me that information." Defense counsel immediately objected and moved for a mistrial, arguing that the prosecutor's statement was not supported by facts in evidence and represented his personal opinion about the veracity of Jackson's testimony and her credibility as a witness. The trial court denied the motion and stated the following in support of its decision: "I know what . . . Jackson testified to and what she didn't testify to. And I'm going to make my decision based on what she testified to. . . . I understand the difference. This is an argument to the court. The court is not going to, you know, fall victim to the concerns that you've expressed in your motion for a mistrial. . . . And I have the luxury in this case to be able to rehear the testimony of the witness to the extent I have any uncertainty about precisely what . . . Jackson said or didn't say. . . . So I understand what . . . Jackson testified to, and I understand that [the prosecutor] may have attempted to bring into question the veracity of what she was saying on the stand. I understand also, however, that, even with that effort to impeach, the opposite doesn't become true by virtue of the impeachment. I understand that. . . . The motion for a mistrial is denied. The court did not, incidentally, take the words of [the prosecutor] in the way that [defense counsel] has described them. But, for the reasons I've stated, I will render my decision based on the testimony that the witnesses have given and not any part of the closing argument that may have strayed intentionally or inadvertently, if at all, from the rules that govern the arguments of counsel."

We begin our analysis of the defendant's claim by setting out the legal principles that govern our consideration of claims of prosecutorial impropriety. "[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 733–34, 850 A.2d 199 (2004).

As we previously have recognized, "[p]rosecutorial [impropriety] of [a] constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing

court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 76–77, 43 A.3d 629 (2012); see also *State* v. *Williams*, 204 Conn. 523, 544, 529 A.2d 653 (1987) ("[s]tatements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument").

Furthermore, "a prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . [B]ecause the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 590, 876 A.2d 1162 (2005).

Our determination of whether alleged prosecutorial impropriety deprived a defendant of a fair trial is governed by a "two step analytical process." *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). "The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) Id.

"The latter part of this two-pronged test is guided by the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540]." *State* v. *Gonzalez*, 338 Conn. 108, 125, 257 A.3d 283 (2021). These factors include "whether (1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of . . . evidence." *State* v. *Fauci*, supra, 282 Conn. 51. The burden is on the defendant to establish that the com-

plained of conduct was both improper and so egregious that it resulted in a denial of due process. See, e.g., *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

In this case, we need not decide whether the prosecutor's statements were improper because, even if they were, they did not deprive the defendant of a fair trial. See, e.g., *State* v. *Gibson*, 302 Conn. 653, 663 n.4, 31 A.3d 346 (2011) (noting that "this court occasionally has skipped the first step of [the two step prosecutorial impropriety] analysis when . . . it was clear that there was no due process violation"). Although some of the *Williams* factors weigh in the defendant's favor, the fact that this case was tried to the court, not before a jury, is largely dispositive of the defendant's claim.[10] Here, the trier of fact expressly rejected the allegedly improper statements, and, as a result, we are provided with the requisite assurance that the defendant was not deprived of his right to a fair trial.

On appeal from a bench trial, there is a presumption that the court, acting as the trier of fact, considered only properly admitted evidence when it rendered its decision. See *State* v. *Ouellette*, 190 Conn. 84, 92, 459 A.2d 1005 (1983) (noting that "[i]n trials to the court, where admissible evidence encompasses an improper as well as a proper purpose, it is presumed that the court used [the evidence] only for an admissible purpose"); see also *State* v. *George A.*, 308 Conn. 274, 290, 63 A.3d 918 (2013). This principle is widely recognized by both federal and state courts. See, e.g., *Harris* v. *Rivera*, 454 U.S. 339, 346, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981) ("[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions"); see also *United States* v. *DNRB, Inc.*, 895 F.3d 1063, 1068 (8th Cir. 2018) ("we presume that a judge conducting a bench trial will use evidence properly, mitigating any prejudice"); *United States* v. *Foley*, 871 F.2d 235, 240 (1st Cir. 1989) ("in criminal bench trials, absent an affirmative showing of prejudice, a trial court is presumed to have considered only admissible evidence in making its findings"); *United States* v. *Martinez*, 333 F.2d 80, 82 (2d Cir.) (noting that "when a case is tried without a jury, the error of admitting incompetent evidence will be regarded harmless, if it is rejected and excluded by the judge before the decision is made" (internal quotation marks omitted)), cert. denied, 379 U.S. 907, 85 S. Ct. 199, 13 L. Ed. 2d 178 (1964); *People* v. *Mascarenas*, 181 Colo. 268, 272, 509 P.2d 303 (1973) ("[i]t is presumed that a trial judge disregards incompetent evidence"); *Commonwealth* v. *Davis*, 491 Pa. 363, 372 n.6, 421 A.2d 179 (1980) ("[a] judge, as [fact finder], is presumed to disregard inadmissible evidence and consider only competent evidence").

Both federal and state courts have also applied the principles underlying this presumption in cases involv-

ing claims of prosecutorial impropriety during bench trials. In the absence of a showing of substantial prejudice, the trial court is presumed to have disregarded improper arguments or comments made by the prosecutor when rendering its decision. See, e.g., *United States* v. *Weldon*, 384 F.2d 772, 774 (2d Cir. 1967) ("appellate courts may presume that improper evidence *and* comments have been rejected when the trial is to the [c]ourt alone, at least absent a showing of substantial prejudice" (emphasis added)); see also *United States* v. *Preston*, 706 F.3d 1106, 1120 (9th Cir. 2013) ("[t]he risk of improperly influencing a judge by placing the prestige of the government in favor of or against a witness or swaying the judge with improper evidence is far less than in a jury trial"), rev'd in part on other grounds, 751 F.3d 1008 (9th Cir. 2014); *Liggett* v. *People*, 135 P.3d 725, 733–34 (Colo. 2006) (presuming that trial court did not "accord weight to the [prosecutor's] improper statements in its decision" during bench trial); *State* v. *Smith*, 61 Ohio St. 3d. 284, 292, 574 N.E.2d 510 (1991) (holding that claim of prosecutorial impropriety lacked merit when trial was to court and presiding judge "affirmatively rejected the prosecutor's comments"), cert. denied, 502 U.S. 1110, 112 S. Ct. 1211, 117 L. Ed. 2d 449 (1992); *Commonwealth* v. *Harvey*, 514 Pa. 531, 537, 526 A.2d 330 (1987) ("we will not *assume* that a verdict rendered by a jurist was influenced by [the prosecutor's] extraneous prejudicial remarks and comments" (emphasis in original)).[11]

We conclude that this reasoning is persuasive and consistent with the law of our state. The well established presumption is based on our recognition that "an experienced trial judge . . . [is] not likely to be swayed" by improperly admitted evidence. *State* v. *George A.*, supra, 308 Conn. 290; see also *Doe* v. *Carreiro*, 94 Conn. App. 626, 640, 894 A.2d 993 (noting that, "in court trials, judges are expected, more so than jurors, to be capable of disregarding incompetent evidence"), cert. denied, 278 Conn. 914, 899 A.2d 620 (2006). We similarly recognize that trial judges, who, unlike jurors, are well versed in the rules that govern the arguments of counsel during a trial, are also less likely to be influenced by improper comments or arguments made by counsel during a bench trial.[12]

In the present case, following defense counsel's objection to the prosecutor's remarks, the trial court acknowledged the concerns that motivated the objection and expressly stated that it would not consider the prosecutor's statements when rendering its decision. The trial court also noted that, had the prosecutor's comments been made during a jury trial, the court would have instructed the jurors that it was their recollection of the evidence that controlled and that they should disregard "anything that the lawyers say [that] is at odds with their recollection . . . ." When, as here, a trial court implicitly sustains an objection to a prose-

cutor's comment and expressly states that it will not consider the challenged comment when arriving at its decision, a defendant is unlikely to meet his burden of establishing that he was deprived of his right to a fair trial.[13] Given that the record in the present case is devoid of any evidence that the trial court failed to follow its own instructions, we conclude that the defendant has failed to meet this burden.

Although the trial court's statements provide us with the requisite assurance that the defendant was not deprived of his right to a fair trial, we recognize that some of the *Williams* factors weigh in the defendant's favor. The state concedes in its brief that the prosecutor's comment was uninvited by the defendant and that our prior decisions have characterized cases that turn entirely on the credibility of the sexual assault complainant as "not particularly strong . . . ." See, e.g., *State* v. *Jones*, 320 Conn. 22, 45, 128 A.3d 431 (2015). We further acknowledge that the statement at issue relates directly to the credibility of R's testimony and is, as a result, central to a critical issue in the case. See *State* v. *Maguire*, 310 Conn. 535, 561–62, 78 A.3d 828 (2013). Finally, to the extent that the allegedly improper statement was not based on a reasonable inference from Jackson's testimony, it could be considered severe. See *State* v. *Singh*, 259 Conn. 693, 717–18, 793 A.2d 226 (2002).

Nevertheless, these factors are insufficient to establish that the prosecutor's single comment deprived the defendant of a fair trial under the circumstances. See *State* v. *Wilson*, 308 Conn. 412, 450, 64 A.3d 91 (2013) (noting that one *Williams* factor was "ultimately dispositive of the issue of harmfulness"); see also *State* v. *Pereira*, 72 Conn. App. 545, 563, 805 A.2d 787 (2002) (recognizing that *Williams* factors "are nonexhaustive, and do not serve as an arithmetic test for the level of prejudice flowing from misconduct"), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003). As we discussed previously in this opinion, the trial court's statements in response to the prosecutor's remark, as well as the absence of any evidence that the trial court considered the remark when arriving at its decision, demonstrate that the finder of fact was uninfluenced by the alleged prosecutorial impropriety. The defendant's claim that he was deprived of a fair trial, therefore, fails.

### III

We next address the defendant's two claims concerning the sufficiency of the evidence presented at trial. First, the defendant claims that he is entitled to a judgment of acquittal on all counts because the state's evidence was insufficient to prove that he engaged in the underlying criminal conduct described by R during her forensic interview and trial testimony. According to the defendant, no reasonable trier of fact could have found that he inappropriately touched R in 2015, because he

presented three witnesses who contradicted R's testimony and "no witnesses confirmed [R's] allegations . . . ." Second, the defendant claims that the evidence was insufficient to establish that he acted with the specific intent necessary to be convicted of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A). Specifically, the defendant argues that the evidence was insufficient to prove beyond reasonable doubt that he acted with the intent to degrade or humiliate R, or that he gained sexual gratification from engaging in the conduct in question. The state disagrees, arguing that the evidence presented at trial was sufficient to support the defendant's convictions. We agree with the state.

The following additional facts and procedural history are relevant to our consideration of the defendant's claims. At trial, the defendant testified on his own behalf and presented the testimony of his former girlfriend, Chantell Sinclair, and his sister, Claudia Smith. Both Sinclair and Smith testified that R experienced dry and irritated skin around her vaginal area. Sinclair specifically testified that on one occasion, R told her and the defendant that the skin around her vaginal area was "burning." According to Sinclair, the defendant supervised R as she cleaned herself, but he did not touch her directly. The defendant, in his testimony, denied inappropriately touching R in 2015, and accused both R and her mother of fabricating the allegations.

At the close of the state's case-in-chief, defense counsel moved for a judgment of acquittal on counts one through five, claiming that the state's evidence was insufficient to support a conviction of sexual assault in the first, third, or fourth degree.[14] The court granted the defendant's motion as to both counts of sexual assault in the third degree, counts two and three, and denied his motion as to the single count of sexual assault in the first degree, count one, and the two counts of sexual assault in the fourth degree, counts four and five.[15] At the close of evidence, defense counsel renewed the motion for a judgment of acquittal as to counts one, four, and five. The trial court again denied the motion.

In its oral decision, the trial court articulated its factual findings and identified the evidentiary basis for its verdict. The trial court began by noting that "the state has proven beyond a reasonable doubt that the defendant . . . did engage . . . in the behavior described by R in her testimony and in her forensic interview." In reaching this conclusion, the trial court stated that it "found R's account to be credible and . . . rejected the contrary testimony offered by the defendant . . . ." Relying on R's account of the defendant's conduct, the trial court concluded that the state's evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt of sexual assault in the first degree, contained in count one, sexual assault in the fourth degree, contained in count four, and two counts of risk of injury

to a child, contained in counts six and seven.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 799–800, 877 A.2d 739 (2005); see also *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020) (noting that defendant asserting insufficiency claim "carries a difficult burden" (internal quotation marks omitted)).

Moreover, it is well established that "[w]e may not substitute our judgment for that of the [finder of fact] when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the [finder] of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 323, 96 A.3d 1199 (2014).

We first consider the defendant's broad claim that the evidence was legally insufficient to sustain his conviction on all counts. In support of this claim, the defendant relies entirely on the fact that R's testimony was uncorroborated and was contradicted by three "third party witnesses . . . ." According to the defendant, the sheer numerical superiority of contradictory testimony rendered the state's evidence insufficient as a matter of law. The defendant's claim is wholly without merit.

We have repeatedly recognized that "[t]he issue [of guilt] is not to be determined solely by counting the witnesses on one side or the other." (Internal quotation marks omitted.) *State* v. *Hodge*, 153 Conn. 564, 573, 219 A.2d 367 (1966); see also *State* v. *Nerkowski*, 184 Conn. 520, 525 n.5, 440 A.2d 195 (1981). The testimony of "a single witness is sufficient to support a finding of guilt beyond a reasonable doubt." *State* v. *Whitaker*, 215 Conn. 739, 757 n.18, 578 A.2d 1031 (1990). In sexual assault cases specifically, we have recognized that a victim's uncorroborated testimony, in and of itself, can be sufficient to establish a defendant's guilt. See, e.g., *State* v. *Stephen J. R.*, 309 Conn. 586, 595, 72 A.3d 379 (2013) ("it is well established that a victim's testimony

need not be corroborated to be sufficient evidence to support a conviction"); see also *State* v. *Monk*, 198 Conn. 430, 433, 503 A.2d 591 (1986).

In the present case, the trial court credited R's testimony and discredited the contradictory testimony provided by the defendant, two of his former girlfriends, and his sister. The trial court made its credibility determination clear in its oral ruling, stating that it "found R's account to be credible and . . . rejected the contrary testimony offered by the defendant in his own testimony, by witnesses called by him, and in his cross-examination of other witnesses."[16] In crediting R's testimony and discrediting the testimony of other witnesses, the trial court acted within its authority as the trier of fact. See, e.g., *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014) ("[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility" (internal quotation marks omitted)); see also *State* v. *Hodge*, supra, 153 Conn. 572–73. Because R's testimony was sufficient to support the trial court's conclusion that the defendant engaged in the underlying criminal conduct, the defendant's broad sufficiency claim fails. See, e.g., *State* v. *White*, 155 Conn. 122, 123, 230 A.2d 18 (1967) ("[t]he credibility to be accorded the testimony of the victim was for the [trier of fact] to determine and, if credible, her testimony was sufficient to establish the commission of the crime").

We next consider the defendant's claim that there was insufficient evidence to prove beyond a reasonable doubt that he acted with the intent necessary to be convicted of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A). Under § 53a-73a (a), "[a] person is guilty of sexual assault in the fourth degree when . . . (1) [s]uch person subjects another person to sexual contact who is (A) under thirteen years of age and the actor is more than two years older than such other person . . . ." General Statutes § 53a-65 (3) defines "[s]exual contact" as "any contact with the intimate parts of a person for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person." Section 53a-65 (8), in turn, defines "[i]ntimate parts" to include, inter alia, "the genital area . . . ." In the present case, the burden was, therefore, on the state to prove beyond a reasonable doubt that the defendant had contact with R's genital area for the purpose of sexual gratification or for the purpose of degrading or humiliating her. See, e.g., *State* v. *Michael H.*, 291 Conn. 754, 760, 970 A.2d 113 (2009).

The defendant claims that the evidence presented at trial was insufficient to establish that he acted with the intent to degrade or humiliate R, or that he acted for

the purpose of sexual gratification. Specifically, the defendant argues that the evidence presented demonstrates only that, if the conduct did occur, it was as a result of his concern for R's health. Based on our review of the record, we conclude that the evidence presented at trial was sufficient to support the trial court's conclusion that the defendant acted with the intent to degrade or humiliate R or acted for the purpose of sexual gratification.

It is well established that "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as . . . the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Saez*, 115 Conn. App. 295, 302–303, 972 A.2d 277, cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009); see also *State* v. *Lamantia*, 336 Conn. 747, 756–57, 250 A.3d 648 (2020).

In the present case, R's testimony alone was sufficient to support the trial court's conclusion that the defendant made contact with R's intimate parts for the purpose of degrading or humiliating her. See, e.g., *State* v. *Michael H.*, supra, 291 Conn. 760–61 (testimony of sexual assault victim provided "sufficient evidence that the defendant had contact with the intimate parts of [the victim] for the purposes of sexual gratification"). As the trial court aptly noted in its decision, "[t]he evidence in this case proves that the defendant forced [R] to lie completely unclothed on his bed, sometimes with [the defendant's] girlfriends present, so that he, the defendant, could place his hands and a wash cloth in, and on, R's genital area, at times pulling apart R's external genitalia to look inside, knowing full well from [R's] words and actions that this conduct embarrassed her and that she wished for him to stop doing it." Viewing the evidence in a light most favorable to sustaining the verdict, we agree with the trial court and conclude that the defendant's physical conduct and his continued abuse of R, despite her repeated requests that he stop, supports a "reasonable and logical inference . . . that the defendant's touching of R was undertaken for the purpose of humiliating and degrading her." See, e.g., *State* v. *Michael H.*, supra, 760–61; see also *State* v. *McGee*, 124 Conn. App. 261, 263, 273, 4 A.3d 837 (evidence that defendant touched and twisted victim's breast during robbery was sufficient to support finding that defendant intended to degrade or humiliate victim), cert. denied, 299 Conn. 911, 10 A.3d 529 (2010), cert. denied, 563 U.S. 945, 131 S. Ct. 2114, 179 L. Ed. 2d 908

(2011); *In re Mark R.*, 59 Conn. App. 538, 542, 757 A.2d 636 (2000) (evidence that defendant attempted to pull down victim's pants and "smacked the victim's buttocks more than once . . . in a school hallway in front of several people . . . support[ed] a reasonable inference" that defendant intended to degrade or humiliate victim).

Moreover, we also conclude that the state's evidence was sufficient to support the trial court's finding that the defendant acted for the purpose of sexual gratification. In its decision, the trial court stated that the defendant's contact with R's vaginal area and his penetration of R's vagina supported an inference that the defendant's conduct was "done for the defendant's sexual gratification . . . ." The court also noted that "the repeated and almost ritualistic nature of the defendant's conduct in this case makes an inference of sexual gratification a particularly reasonable one." Having reviewed the record, we agree with the trial court and conclude that R's trial testimony and forensic interview support a reasonable inference that the defendant engaged in the conduct in question for the purpose of sexual gratification. See *State* v. *Michael H.*, supra, 291 Conn. 760–61 (defendant's intent to commit sexually gratifying act was inferred in case in which defendant rubbed his hands over minor victim's genital area); *State* v. *Montoya*, 110 Conn. App. 97, 103, 954 A.2d 193 (defendant's touching of minor victim's vagina constituted evidence of intent to commit sexually gratifying act), cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008); see also *State* v. *John O.*, 137 Conn. App. 152, 159, 47 A.3d 905, cert. denied, 307 Conn. 913, 53 A.3d 997 (2012).

For the foregoing reasons, we conclude that the evidence was sufficient to support the defendant's convictions.

IV

Finally, the defendant claims that the statutes criminalizing sexual assault in the first degree, § 53a-70 (a) (2), and risk of injury to a child, § 53-21 (a) (2), are unconstitutionally vague as applied to his conduct, in violation of his right to due process.[17] Specifically, the defendant claims that neither statute provided him with adequate notice that the conduct underlying his convictions was criminal.[18] In support of his argument, the defendant contends that his conduct was the product of a good faith concern about R's hygiene and that no reasonable person could have been aware that the conduct was criminally prohibited. In response, the state argues that neither statute is unconstitutionally vague as applied to the defendant because the plain language of those statutes, coupled with relevant judicial decisions, provide fair and adequate notice that the defendant's conduct was criminal. The state also argues that the facts of this case demonstrate that the defendant had actual notice that his conduct was prohibited

by statute. We agree with the state and conclude that neither statute is unconstitutionally vague as applied to the defendant's conduct because he had fair and adequate notice that his conduct was criminally proscribed.

The following additional facts and procedural history are relevant to our consideration of the defendant's claim. Prior to closing arguments, defense counsel moved for a judgment of acquittal on the risk of injury charges in counts six and seven, arguing that § 53-21 (a) (1) and (2) were unconstitutionally vague as applied to the defendant's conduct. The trial court reserved ruling on the defendant's vagueness claim, and, following closing arguments, defense counsel extended the defendant's vagueness challenge to the first degree sexual assault charge under § 53a-70 (a) (2).

After rendering its verdict, the trial court denied the defendant's motions, reasoning that "the language of each of these statutes, either alone or in conjunction with judicial gloss already placed on certain portions of language in these statutes by the Connecticut courts, [put] the defendant . . . on notice that the particular behavior alleged in this case was prohibited, and, as to this particular behavior, the defendant was not at risk of being subject to standardless law enforcement." The trial court further noted that "[t]he defendant himself admitted in his testimony that he knew any touching of his daughter of the nature she described was inappropriate. In light of that admission and the facts presented in the case and found credible by the court, the court concludes that the defendant has failed to meet his heavy burden of demonstrating beyond a reasonable doubt that he had inadequate notice of what was prohibited or that he was the victim of arbitrary enforcement."[19]

Before addressing the merits of the defendant's claim, we note the legal principles that guide our decision. "A party attacking the constitutionality of a validly enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt . . . [and we] indulge in every presumption in favor of the statute's constitutionality . . . ." (Citations omitted.) *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991). "The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review." *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010).

"The vagueness doctrine derives from two interrelated constitutional concerns. . . . First, statutes must provide fair warning by ensuring that [a] person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . Second, in order to avoid arbitrary and discriminatory enforcement, statutes must establish minimum guidelines governing their application." (Citations omit-

ted; internal quotation marks omitted.) *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 458, 984 A.2d 748 (2010); see also *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 156, 947 A.2d 282 (2008) ("[t]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement" (internal quotation marks omitted)).

"For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue." (Internal quotation marks omitted.) *State* v. *Jones*, 215 Conn. 173, 180, 575 A.2d 216 (1990). To prevail on such a claim, the defendant must "demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." (Internal quotation marks omitted.) *State* v. *Winot*, supra, 294 Conn. 759.

"The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . . [O]ur fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Bloom*, 86 Conn. App. 463, 469, 861 A.2d 568 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1081 (2005); see also *State* v. *Pickering*, 180 Conn. 54, 61, 428 A.2d 322 (1980) (noting that "a penal statute may survive a vagueness attack solely upon a consideration of whether it provides fair warning").

In the present appeal, the defendant claims that both §§ 53a-70 (a) (2) and 53-21 (a) (1) are unconstitutionally vague as applied to his conduct because neither statute provided him with adequate notice that his conduct, as described by R, was criminally prohibited. We disagree and conclude that the language of both statutes and the relevant judicial decisions interpreting them provide a person of ordinary intelligence with fair notice that the digital penetration of a minor's vagina and the touching of a minor's vagina with a rag in a sexual and inde-

cent manner are criminally prohibited.

As to the defendant's claim concerning his conviction of sexual assault in the first degree, § 53a-70 (a) (2) criminally prohibits a person from engaging "in sexual intercourse with another person . . . [who] is under thirteen years of age [when] the actor is more than two years older than such person . . . ." Section 53a-65 (2) defines "[s]exual intercourse" as, inter alia, "vaginal intercourse," and specifies that "[p]enetration, however slight, is sufficient to complete vaginal intercourse . . . ." In our prior decisions interpreting § 53a-70, we have recognized that "digital penetration . . . of the genital opening . . . is sufficient to constitute vaginal intercourse." (Emphasis omitted.) *State* v. *Albert*, 252 Conn. 795, 806–807, 750 A.2d 1037 (2000). The trial court in this case specifically concluded that "R's testimony . . . established that the defendant penetrated [her]." Furthermore, during her forensic interview, R stated that her vagina "ache[d] hard" as a result of the defendant's "dig[ging] through" the "deep dark" part. Given the plain language of § 53a-70 (a) (2), and the relevant judicial gloss that has been placed on that statute, we conclude that a person of ordinary intelligence would know that the defendant's digital penetration of R's vagina was criminally prohibited.

As to the risk of injury statute, § 53-21 (a) (2) prohibits "contact with the intimate parts . . . of a child under the age of sixteen years . . . in a sexual and indecent manner likely to impair the health or morals of such child . . . ." The definition of "[i]ntimate parts" contained in § 53a-65 (8) includes the "genital area . . . ." Our prior "opinions pursuant to § 53-21 make it clear that the deliberate touching of the private parts of a child under the age of sixteen in a sexual and indecent manner is violative of [the] statute." *State* v. *Pickering*, supra, 180 Conn. 64. In the present case, the trial court expressly found that the defendant's conduct involved deliberate touching of this nature. In reaching this conclusion, the trial court reasoned: "[T]he touching by the defendant of R was sexual in nature . . . [and] indecent; that is, in doing what the defendant did to his ten year old daughter, the defendant engaged in conduct that is offensive to good taste and public morals. The court concludes that the defendant's touching of R was not innocent, was not accidental, and was not inadvertent."[20] As was the case in *Pickering*, "[t]his is not a situation where the state is holding an individual criminally responsible for conduct he could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *State* v. *Pickering*, supra, 64–65. The defendant's conduct, as described by the trial court, falls well within the scope of § 53-21, and, as a result, the statute may be constitutionally applied to him.

For the foregoing reasons, we conclude that the defendant has failed to demonstrate that §§ 53a-70 (a)

(2) and 53-21 (a) (1) do not provide fair warning that the digital penetration of a minor's vagina in a sexual and indecent manner is criminally prohibited. The defendant's constitutional vagueness claims, therefore, fail.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** July 28, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] The court, *Simón, J.*, ultimately granted the defendant's motion for a directed verdict during the trial of the neglect petition filed against the defendant, but that court also advised the defendant "to very carefully consider the recommendations of the doctors and what they believe to be the appropriate way to address the concerns that you believe exist with your daughter and proceed in the proper medically advised manner."

During trial in the present case, the state introduced the defendant's written agreement to show that he had acknowledged that his cleaning methods were unnecessary and that he had agreed to stop touching R's vagina.

[3] The information did not identify the specific acts that corresponded to each count, and the defendant did not request a bill of particulars. At the close of the state's case-in-chief, however, defense counsel moved for a judgment of acquittal on counts one through five, and, during argument on that motion, the prosecutor specified that one count of sexual assault in the fourth degree, count four, related to the defendant's contact with R's vagina, and the second count of sexual assault in the fourth degree, count five, related to the defendant's contact with her breasts.

[4] The trial court found the defendant not guilty on the second count of sexual assault in the fourth degree and granted defense counsel's motion for a judgment of acquittal as to both counts of sexual assault in the third degree. At sentencing, the trial court also vacated the defendant's conviction of one count of risk of injury to a child based on double jeopardy grounds.

[5] This court ordered the parties to file supplemental briefs "addressing the effect on [this] appeal, if any, of [our] recently released decision in *State* v. *Manuel T.*, 337 Conn. 429, 254 A.3d 278 (2020), with respect to the issue regarding the admission of forensic interview evidence under the medical treatment exception to the hearsay rule."

[6] Prior to calling Craft, the prosecutor moved to admit the video recording based on the testimony of Lisa Murphy-Cipolla, an employee of the Children's Advocacy Center who was not present during Craft's interview of R. The trial court denied the state's motion on the ground that Murphy-Cipolla had not conducted the interview. Several days later, the state arranged for Craft, who was living out of state at the time of trial, to travel to court to testify.

[7] As was the case in *State* v. *Manuel T.*, 337 Conn. 429, 254 A.3d 278 (2020), the trial court in the present case assessed the admissibility of the video recording of the forensic interview in its entirety and did not assess the admissibility of individual statements made during the interview. We recognize that the trial court's approach was likely a reflection of the position taken by defense counsel who, in opposing the prosecutor's motion to admit the video recording, argued that the recording should be excluded in its entirety. In response to defense counsel's "all or nothing" approach, the trial court remarked, "[s]o, it's either in or it's out, and if it's in, it can be played in its entirety." Given the formulation of defense counsel's opposition to the admission of the video recording, as well as the fact that the present case was tried before the court, we believe that the trial court's response was reasonable. We do, however, take this opportunity to emphasize that the purpose underlying the medical treatment exception to the hearsay rule does not preclude a party from objecting to portions of statements made during forensic interviews that are either inadmissible for the purpose they are offered or are otherwise unduly prejudicial. Under such circumstances, the court, particularly during a jury trial, may exercise its discretion to redact portions of a forensic interview.

[8] In *Manuel T.*, we expressly declined to address whether such an inference can be made in cases involving children "too young to have the conscious purpose of obtaining medical treatment to advance [their] own health." *State* v. *Manuel T.*, supra, 337 Conn. 441 n.12, citing *State* v. *Dollinger*, 20 Conn. App. 530, 536, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990); see *State* v. *Dollinger*, supra, 536–37 (inferring that statements of two and one-half year old child were made for purpose of obtaining medical treatment). We need not address the issue because, as was the case in *Manuel T.*, the declarant in the present case was old enough to have the conscious purpose of obtaining medical treatment.

[9] In support of his claim that the trial court abused its discretion in admitting the video recording of the interview of R, the defendant mistakenly focuses the entirety of his argument on the purpose of the interview and fails to address whether R's statements were motivated by a desire to receive medical treatment and were pertinent to that end. Although the purpose of the interview and the declarant's understanding of that purpose are relevant to determining the motivation of the declarant; see *State* v. *Donald M.*, supra, 113 Conn. App. 71 (considering purpose of interview when determining purpose of declarant's statements); the admissibility of specific statements, as we made clear in *Manuel T.*, turns on the "purpose for which the statement was made," not the overall purpose of the interview. (Internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 337 Conn. 443, quoting *State* v. *Mendez*, 148 N.M. 761, 772, 242 P.3d 328 (2010); see also *State* v. *Dollinger*, 20 Conn. App. 530, 536, 568 A.2d 1058 (noting that "[t]he test focuses on the declarant's motives"), cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). In *Manuel T.*, we noted that "the tender years exception considers the purpose of the interview, whereas the medical treatment exception focuses on the declarant's purpose in making individual statements." *State* v. *Manuel T.*, supra, 447.

[10] Although this factor is dispositive in the present case, it will not always be so. Prosecutorial impropriety of a particularly egregious nature could, under certain circumstances, significantly impact a trial court's consideration of the issues presented and, as a result, deprive a defendant of a fair trial. Indeed, in discussing the potential harm that improperly admitted evidence can have on the fairness of a civil bench trial, this court has previously noted that "[t]here may be instances where it is so unclear what effect the disputed evidence might have had, or where its prejudicial effect is so overwhelming, that the fair administration of justice requires a new trial." *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 409, 439 A.2d 1024 (1981). The same is true in cases involving alleged prosecutorial impropriety, and, as such, each case must be decided on its specific facts.

[11] Courts have recognized that this presumption can be overcome if the defendant can establish that the trial court was both influenced and prejudiced by the impropriety. See, e.g., *United States* v. *Stinefast*, 724 F.3d 925, 931 (7th Cir. 2013) ("[t]o overcome this presumption of conscientiousness on the part of [federal] district [court] judges, a party must present some evidence that the statement influenced the court's [decision making]"); see also *United States* v. *Weldon*, supra, 384 F.2d 774 ("appellate courts may presume that improper evidence and comments have been rejected when the trial is to the [c]ourt alone, at least absent a showing of substantial prejudice"). We have similarly recognized this principle in the purely evidentiary context. See *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 408–409, 439 A.2d 1024 (1981).

[12] The Appellate Court has applied a similar concept, the broader presumption that the trial court did not act in error, to conclude that alleged prosecutorial impropriety during a bench trial did not deprive a defendant of a fair trial. See, e.g., *State* v. *John M.*, 87 Conn. App. 301, 321 n.15, 865 A.2d 450 (2005) (citing *Carothers* v. *Capozziello*, 215 Conn. 82, 105, 574 A.2d 1268 (1990)), aff'd, 285 Conn. 822, 942 A.2d 323 (2008).

[13] The defendant argues that the trial court's express commitment to ignore the prosecutor's statement concerning Jackson's testimony was "inadequate to protect against" the prejudicial impact of the comment. According to the defendant, the prosecutor has "far more inherent credibility with the court than an average person," and, as a result, "[t]he trial court would be especially inclined to believe [the prosecutor's] assertions or recollection of . . . Jackson's statements than to believe . . . Jackson herself." We firmly reject the defendant's suggestion that the trained and experienced trial judge was incapable of acting as a fair and impartial finder of fact in the present case. In jury trials, we presume that the jury follows the curative instructions of the trial court regarding references by counsel to facts not in evidence. See,

e.g., *State* v. *McCoy*, 331 Conn. 561, 573–74, 206 A.3d 725 (2019). "It would be anomalous . . . to hold that an experienced trial . . . judge cannot similarly disregard evidence that has not properly been admitted." *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 408–409, 439 A.2d 1024 (1981); see also *Harris* v. *Rivera*, supra, 454 U.S. 346 ("surely we must presume that [trial judges] follow their own instructions when they are acting as [fact finders]").

[14] Prior to closing arguments, defense counsel also moved for a judgment of acquittal on counts six and seven, arguing that the risk of injury statute was unconstitutionally vague as applied to the defendant's conduct. The court reserved ruling on the vagueness claim until after closing arguments. The defendant's constitutional vagueness claims are addressed subsequently in this opinion.

[15] Count four related to the defendant's contact with R's vagina and count five related to his contact with her breasts.

[16] The trial court also "conclude[d] that the defendant has testified falsely in asserting that he did not engage in the conduct described by R that forms the factual basis of the allegations in this criminal proceeding. And having reached this conclusion that the defendant has testified falsely, it is proper for this court to carefully consider whether it should rely upon any of the defendant's testimony."

[17] It is unclear if the defendant intended to raise his vagueness claim under both the state and federal constitutions. In one sentence in his brief, the defendant states that the relevant statutes are vague as applied to him "[e]ven under a strictly federal analysis . . . ." The defendant's brief is devoid of any reference to the state constitution, and defense counsel did not refer to a state constitutional claim during oral argument before this court. Given the defendant's failure to sufficiently allege a state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), we only consider his federal constitutional vagueness claim. See, e.g., *State* v. *Wilchinski*, 242 Conn. 211, 217 n.7, 700 A.2d 1 (1997). We note, however, that "we have applied the same analysis to vagueness claims brought pursuant to both the state and the federal constitutions." *State* v. *Ward*, 306 Conn. 718, 742 n.15, 51 A.3d 970 (2012).

[18] "To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant must] . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 759, 988 A.2d 188 (2010). On a single page in his brief, the defendant appears to raise a claim under the second prong of the as applied vagueness test, that is, the guarantee against arbitrary and discriminatory law enforcement. In support of this claim, the defendant argues that the statutes at issue could criminalize otherwise innocent conduct, such as the medical examination of a child or the changing of an infant's diaper. To the extent that the defendant claims that he is a victim of arbitrary enforcement under the statutes, his claim fails. As we explain in greater detail subsequently in this opinion, the hypothetical applicability of these statutes to conduct unrelated to the defendant's own actions is irrelevant to our consideration of whether the statutes were unconstitutionally vague as applied to the defendant's conduct. See *State* v. *Josephs*, 328 Conn. 21, 31–32, 176 A.3d 542 (2018). Because the defendant fails to argue that *he* was the victim of arbitrary or discriminatory enforcement, we only consider his claim that the statutes were unconstitutionally vague as applied to his conduct because they failed to provide him with adequate notice that his conduct was criminally prohibited.

[19] The trial court vacated the defendant's conviction on the seventh count of the information, which charged him with risk of injury to a child in violation of § 53-21 (a) (1), on double jeopardy grounds. The defendant's vagueness claim is, therefore, limited to his conviction on count one, under § 53a-70 (a) (2), and on count six, under § 53-21 (a) (2).

[20] In support of his claim that he lacked adequate notice, the defendant contends that his conduct was based on "mistaken hygiene concerns," and, because he believed that his conduct was appropriate, he had no reason to suspect that he was engaging in a criminal act. The trial court, however, expressly rejected the defendant's argument that his conduct was motivated by an innocent desire to help R. In reaching this conclusion, the trial court found: "[T]he defendant was not acting under a mistaken belief or other excuse because he knew from doctors and [employees of the department] that what he was doing to R was inappropriate and not medically or hygienically justified when she was [three] years old and because he himself admitted in his testimony that he knew it would be wrong to do it when she

was ten."

_____